*Case Number 12-8090*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

YOLANDA EVERT, individually and as the
Qualified Wrongful Death Representative
of Erwin Evert, deceased,

      Plaintiff/Appellant,

v.

THE UNITED STATES OF AMERICA,

      Defendant/Appellee.

### APPELLANT'S REPLY BRIEF

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING*
*THE HONORABLE NANCY D. FREUDENTHAL, D.C. NO. 2:11-CV-00339-NDF*

Respectfully submitted May 9, 2013

> Emily R. Rankin
> Mark L. Aronowitz
> THE SPENCE LAW FIRM, LLC
> P.O. Box 548
> 15 S. Jackson St.
> Jackson, WY 83001
> Telephone: (307) 733-7290
> Fax: (307) 733-5248
> rankin@spencelawyers.com
> aronowitz@spencelawyers.com
> Attorneys for Plaintiff/Appellant

### ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES .................................................................................. ii

I.     ARGUMENT.................................................................................................. 1

    A.     WYOMING COMMON LAW FILLS THE VOID THAT APPELLEE IGNORES
          AND TERMS "IRRELEVANT" .................................................................... 1

    B.     WITH BEAR #646 PRESENT, SITE #3 CANNOT QUALIFY AS "LAND FOR
          RECREATIONAL PURPOSES ...................................................................... 4

    C.     GRANTING IMMUNITY RENDERS THE PERMITS, CLOSURE ORDER AND
          AGREEMENT WITH THE USFS MEANINGLESS ........................................ 8

    D.     NINTH CIRCUIT LAW SPANS THE GAP THAT APPELLEE FAILS TO
          ACKNOWLEDGE EXISTS IN WYOMING DECISIONAL LAW REGARDING
          THE WRUA ............................................................................................ 9

    E.     CONSCIOUSLY DISREGARDING THE KNOWN RISK OF A GOVERNMENT
          CREATED EXTREME DANGER IN FAVOR OF PERSONAL CONVENIENCE
          CONSTITUTES WILLFULNESS ................................................................ 11

II.    CONCLUSION.............................................................................................. 14

III.   CERTIFICATE OF COMPLIANCE ............................................................. 16

IV.   CERTIFICATE OF DIGITAL COMPLIANCE ............................................ 17

V.    CERTIFICATE OF SERVICE ...................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Kaycee Land & Livestock v. Flahive*,
2002 WY 73, 46 P.3d 323 (Wyo. 2002) .................................................................. 2

*Merrill v. Jansma*,
2004 WY 26, 86 P.3d 270 (Wyo. 2004) .................................................................. 2

*Sublette Cnty. Sch. Dist. No. Nine v. McBride*,
2008 WY 152, 198 P.3d 1079 (Wyo. 2008) ........................................................... 3

*Young v. Salt Lake City Corp.*,
876 P.2d 376 (Utah 1994) ..................................................................................... 3

*Scott v. Wright*,
486 N.W.2d 40 (Iowa 1992) ................................................................................... 3

*Del Costello v. Hudson Railway Co. Inc.*,
274 A.D.2d 19, 711 N.Y.S.2d, 77 (N.Y.App.Div. 2000) ...................................... 4

*Holland v. Weyher/Livesy Const., Inc.*,
651 F. Supp. 409 (D. Wyo. 1987) .............................................................. 4, 5, 6, 8

*Wedelstedt v. Wiley*,
477 F.3d 1160 (10th Cir. 2007) ........................................................................... 10

*Maple v. Citizens Nat. Bank & Trust Co.*,
437 F. Supp. 66 (W.D. Okla. 1977) ..................................................................... 10

*Klepper v. City of Milford, Kan.*,
825 F.2d 1440 (10th Cir. 1987) ..................................................................... 10, 11

*Yalowizer v. Husky Oil Co.*,
629 P.2d 465 (Wyo. 1981) ................................................................................... 12

## Constitution and Statutes

Wyo. Const. Art. 2, § 1 ............................................................................................... 3

Wyo. Stat. Ann. § 8-1-101 (West) ............................................................................. 3

Wyo. Stat. Ann. § 34-19-103(a) (West) .................................................................... 6

## I.   ARGUMENT

The United States seeks legal immunity despite both negligent and willful conduct resulting in Mr. Erwin Evert's mauling death. As discussed in Mrs. Evert's opening brief, Wyoming common law applies to the Government employees' affirmative acts of negligence, including the removal of already-posted warning signs at Site #3 while a research grizzly remained present, the failure to speak to cabin owners as requested by the United States Forest Service,[1] and the failure to comply with applicable state and federal permits and closure orders. (Aplt. Br. at 15-22). For these reasons, the district court's grant of summary judgment should be reversed.

### A.   WYOMING COMMON LAW FILLS THE VOID THAT APPELLEE IGNORES AND TERMS "IRRELEVANT"

Immunity under the WRUA simply does not invalidate all other state law as the Government posits. This is exactly why Mrs. Evert cited the relevant and applicable Wyoming common law for analyzing the IGBST crew's affirmative acts of negligence. (Aplt. Br. at 20-22). In enacting the WRUA the legislature did not nullify application of all common law. Therefore, a court may look to the common law in determining the contours of statutory immunities. As the Wyoming Supreme Court explained:

---

[1] *See* Aplt. Br. at 7 discussing the Shoshone National Forest's requirement that the IGBST trappers inform area residents of their trapping activities.

1

> " 'It is not to be presumed that the legislature intended to abrogate or
> modify a rule of the common law by the enactment of a statute upon
> the same subject; it is rather to be presumed that no change in the
> common law was intended unless the language employed clearly
> indicates such an intention.... The rules of common law are not to be
> changed by doubtful implication, nor overturned except by clear and
> unambiguous language.' "

*Kaycee Land & Livestock v. Flahive*, 2002 WY 73, ¶ 9, 46 P.3d 323, 327 (Wyo.

2002) (quoting *Allstate Ins. Co. v. Wyoming Ins. Dep't,* 672 P.2d 810, 824 (Wyo.

1983) (internal quotation omitted)); *see also Merrill v. Jansma*, 2004 WY 26, ¶ 34,

86 P.3d 270, 285-86 (Wyo. 2004) ("Statutes are not to be understood as effecting

any change in the common law beyond that which is clearly indicated *either by*

*express terms or by necessary implication from the language used*."). A court does

"not review statutes in isolation but rather construe[s] them in relation to and in

harmony with existing law and as part of a general and uniform system of

jurisprudence." *Merrill*, 2004 WY 26, ¶ 40, 86 P.3d at 287.

The Government criticizes Mrs. Evert's WRUA common law analysis and

argues that "[c]ommon law duties are irrelevant to a discussion of statutorily

created duties."[2] (Aplee. Br. at 26-33).[3] To accept the Government's argument

---

[2] Nevertheless, despite the claimed "irrelevance" of the common law, the
Government relies heavily on Wyoming common law to interpret "willful or
malicious failure[s]" under the WRUA. (Aplee. Br. at 25-33).

2

that common law duties are irrelevant would deny the central role granted the judiciary under the separation of powers doctrine, namely, to interpret laws. Wyo. Const. Art. 2, § 1; *see Sublette Cnty. Sch. Dist. No. Nine v. McBride*, 2008 WY 152, ¶ 21, n.5, 198 P.3d 1079, 1085, n.5 (Wyo. 2008) ("statutory interpretation is a matter for the judiciary, not the legislature"). The legislature agrees that the "common law of England as modified by judicial decisions . . . are the rule of decision in this state when not inconsistent with the laws thereof, and are considered as of full force until repealed by legislative authority." Wyo. Stat. Ann. § 8-1-101 (West).

As with virtually identical RUA's in other states, the WRUA did not nullify *all* Wyoming common law. *See e.g., Young v. Salt Lake City Corp.*, 876 P.2d 376, 378 (Utah 1994)("[t]he operative language of the [virtually identical URUA] does not purport to relieve landowners of their separate duty to conduct themselves in a reasonably safe manner while on the premises"); *Scott v. Wright*, 486 N.W.2d 40, 42 (Iowa 1992)(distinguishing premises liability and intervening acts of negligence by stating, "Nothing in the language of [the virtually identical IRUA] suggests a legislative intent to immunize *all* negligent acts of landowners, their agents, or

---

[3] All citations to Appellee's Brief will be to the red covered hard copy since the page numbers for the ECF copy dated April 22nd and the hard copy diverge at approximately page 17.

3

employees. Nor do we believe such broad application of the statute would serve the public purpose envisioned by the legislature…. The public's incentive to enter and enjoy private agricultural land would be greatly diminished if users were subject, without recourse, to human error as well as natural hazards."); *see also Del Costello v. Hudson Railway Co. Inc.*, 274 A.D.2d 19, 22-23, 711 N.Y.S.2d, 77, 79-80 (N.Y.App.Div. 2000)("Furthermore, the legislative history of the statute [the NYRUA] reveals that it was never intended to relieve a landowner from affirmative acts of negligence."). In the same vein, the Government must be held accountable for its affirmative acts and human errors that created the artificial danger present at Site #3.

## B.   WITH BEAR #646 PRESENT, SITE #3 CANNOT QUALIFY AS "LAND FOR RECREATIONAL PURPOSES"

The Government's mere removal of warning and closure signs did not convert Site #3 to recreational land because an extremely dangerous captured, handled and anesthetized grizzly was present. The presence of the Government's research bear at its study site created the quintessential trap laid for the public. The WRUA does not provide immunity for affirmative acts of negligence that expose the public to fatal risks. The Wyoming legislature never intended "to permit landowners to lay traps for the public and then claim immunity under the Act." *Holland v. Weyher/Livesy Const., Inc.*, 651 F. Supp. 409 (D. Wyo. 1987). Here, the affirmative act of removing the

4

signs at Site #3 while Bear #646 remained present constitutes both a negligent and willful action.

Despite the sparse legislative and judicial guidance regarding the WRUA, the Government attempts to steer this Court away from relying on *Holland*, one of the only relevant decisions. The Government seeks to differentiate *Holland* by characterizing the location in that case as an "industrial subdivision" or "an industrial site and not recreational land." (Aplee. Br. at 22). By doing so, the Government fails to acknowledge that the court's analysis centered on whether the land at issue is appropriate for recreation. Under this analysis, the facts here lead to the same result as in *Holland*. The injured child in *Holland* was recreating in an area too dangerous, and therefore not appropriate, for recreation. Mr. Evert was also recreating in an area too dangerous, and therefore not appropriate, for recreation: Site #3 was dangerously occupied by a partially anesthetized research bear. The mere fact that Mr. Evert was recreating could not render Site #3 an appropriate area for recreational purposes. *See Holland*, 651 F.Supp. at 412 (stating "[d]efendants' analysis of the statue would convert any area into 'recreational land' whenever a child wanders onto a dangerous site to play"). As in *Holland*, the WRUA does not apply to the circumstances presented here and the Court must look to the common law. (*See* Aplt. Br. at 20-22 (discussing, in part, a

landowner's common law "duty to avoid aggravating a hazard thereby significantly altering it from a naturally occurring condition")).

Wyoming common law must be applied here because Site #3 did not qualify as "land for recreational purposes" at the time Mr. Evert was fatally mauled. *See* Wyo. Stat. Ann. § 34-19-103(a). Site #3 had been closed, with five posted warning and closure signs, from June 12th – 17th, 2010. (Aplt. App. at 45; 57). By regulation and permit, the warning and closure signs had been placed due to the chance of a lured grizzly bear being present in the area. (Aplt. Br. at 15-16). But once the government employees had actual knowledge that their research grizzly bear was present and still recovering, all warning and closure signs were removed.

The Government offers two flawed arguments in its quest for immunity. First, the Government argues Site #3 was opened the moment the warning signs were removed and therefore the site became recreational land. (Aplee. Br. at 24-25). Second, the Government argues that once the signs were pulled, Site #3 "no longer existed as a trap/study site." (Aplee. Br. at 25). Because the WRUA "does not afford absolute immunity to landowners" and does not completely abrogate the common law, including, specifically, affirmative acts of negligence, each argument must fail. *See Holland*, 651 F. Supp. at 412.

 Despite what the Government now argues, the IGBST crew did not remove the required closure and warning signs because the crew deemed Site #3 suitable

6

for recreational purposes. Rather, on June 17, 2010, irrespective of whether they captured a grizzly bear, the IGBST crew intended to pull the signs and head home. (Aplt. App. at 58; 119). Even on appeal, the Government acknowledges that employees removed the closure signs simply because "[t]heir grizzly bear trapping operations were concluded in that area for 2010, and the USGS team would not be returning to the area – intending instead to return to their respective homes in Montana that same day." (Aplee. Br. at 24 n. 21). Whether the area was appropriate and safe for public use was not considered.

In fact, the Government concedes that the presence of the recovering bear at Site #3 at the time its employees removed the signs made it an unsafe area for the public. (Aplt. App. at 160 (USFWS Grizzly Bear Recovery Coordinator Dr. Servheen stated, "[y]ou would never want the public to come in close contact with a bear that is recovering from anesthesia.... It would be dangerous for anybody and dangerous for the bear"). Government team member Seth Thompson recognized that trapped and handled bears are under severe stress and trauma and will occasionally attack with intent to do harm. (Aplt. App. at 126). Mr. Thompson also stated, "[i]t was a known risk" that someone could be mauled after coming into contact with an anesthetized bear. (Aplt. App. at 128). Despite knowing the danger to the public if they were to access Site #3, the Government now incredibly claims the public, and specifically Mr. Evert, was invited to

7

recreate at Site #3. (Aplee. Br. at 25). This untenable argument is made only to avoid the ramifications of the *Holland* decision and the Government employees' failure to conduct their trapping operations in a reasonably safe manner.[4]

## C. GRANTING IMMUNITY RENDERS THE PERMITS, CLOSURE ORDER AND AGREEMENT WITH THE USFS MEANINGLESS

The Government seeks to avoid any consequences from failing to comply with their Shoshone National Forest order and the United States Fish and Wildlife Service and Wyoming Game and Fish permit requirements by arguing that the act of pulling Site #3 magically opened the land to the public and terminated the area's existence as a "trap/study site [thus] the Shoshone order and permits could no longer even apply." (Aplee. Br. at 25). Such a narrow interpretation of the permits and closure order negates their purpose entirely and defies logic. A universal goal of the USFWS and WGF permits, as well as the Shoshone National Forest closure order, was to prevent confrontations between the Government's research grizzly bears and the public. (Aplt. App. at 139-143). The Government employees' removal of the warning and closure signs does not determine whether the area was

---

[4] The Government seems to concede this point with repeated assertions of inclement weather, that the IGBST crew had not seen any members of the public in the immediate vicinity of Site #3, and that they never thought someone would be in the area. These repeated assertions only reinforce the fact that the crew never considered opening Site #3 to recreational use by the public. (Aplee. Br. at 34, 35, 36, 41).

8

properly open pursuant to the permits and closure order; rather, the focus of the permits and order – and therefore the proper analysis – is whether the precise danger identified remains present. Ignoring this most pertinent fact renders the permits and closure order meaningless and allows the Government to determine its own immunity in spite of all logic. Common sense dictates that if a specific area is closed due to the possibility of a bear being captured there, the area ought to remain closed until a captured bear has recovered and is no longer present. The fateful decision to prematurely remove the warning and closure signs does not render Site #3 open for recreational purposes any more than if a strong gust of wind had blown the signs away; instead, it renders Site #3 a deadly trap.

## D.   NINTH CIRCUIT LAW SPANS THE GAP THAT APPELLEE FAILS TO ACKNOWLEDGE EXISTS IN WYOMING DECISIONAL LAW REGARDING THE WRUA

Without any meaningful discussion, the Government dismisses Mrs. Evert's analysis of Ninth Circuit Court of Appeals cases and calls it an "invitation [to this Court] to rely on cases from other jurisdictions and almost exclusively from the Ninth Circuit." (Aplee. Br. at 29). However, precedent analyzing recreational use statutes from the Ninth Circuit, and other state law, proves enormously instructive here due to the specific statutory purpose, the breadth of RUA cases in the Ninth Circuit, and the absence of Wyoming decisional law on this topic. As noted:

Although this court is not bound by other circuits' precedent, *see United States v. Carson,* 793 F.2d 1141, 1147 (10th Cir. 1986), we are guided in our decisions

by their well-reasoned and thoughtful opinions. *See Owens v. Miller* (*In re Miller* ), 276 F.3d 424, 429 (8th Cir. 2002) ("[W]e strive to maintain uniformity in the law among the circuits, wherever reasoned analysis will allow...." (quotation omitted)).

*Wedelstedt v. Wiley*, 477 F.3d 1160, 1165 (10th Cir. 2007); *see also Maple v. Citizens Nat. Bank & Trust Co.*, 437 F. Supp. 66, 68-69 (W.D. Okla. 1977) ("Without benefit of a controlling decision from either the United States Supreme Court or the Court of Appeals for the Tenth Circuit, this Court must consider the Ninth Circuit ruling as substantially binding and should, whenever possible, follow the decision of a court of appeals of a sister circuit." (footnotes omitted)).

Importantly, at the outset of its willfulness analysis, even the district court was "not convinced that the proper test for willful failure to guard or warn is best understood from the definition of wilful and wanton misconduct" and applied "law from jurisdictions with identical 'willful or malicious failure to guard or warn' language." (Aplt. App. at 32). This Court should do the same. The Ninth Circuit has an undeniably significant amount of pertinent, well-developed law for conducting Federal Tort Claims Act/Recreational Use Act analyses. (Aplt. Br. at 34). The Ninth Circuit law cited by Mrs. Evert offers the most reasoned and instructive authority in the context of recreational use statutes. (Aplt. Br. at 34-42).

The Government cites to *Klepper v. City of Milford, Kan.*, 825 F.2d 1440, 1446 (10th Cir. 1987) for the proposition that this Court should reject references to other states' case law. (Aplee. Br. at 29). But in *Klepper*, law from other states

was not dispositive since, uniquely, "Kansas tort law overwhelmingly favors a definition of willfulness as intentionally causing an injury or doing wrong rather than intentionally acting or failing to act in a way that merely allows a wrong to occur." *Klepper*, 825 F.2d at 1446. The requirement of an intent to injure to prove willfulness has been rejected in Wyoming. (*See* Aplt. Br. at 28 (citing *Danculovich v. Brown*, 593 P.2d 187, 191 (Wyo. 1979)).

The Government has not cited to any RUA authority providing immunity to a landowner once the exact condition contemplated by prematurely removed warning and closure signs results in an unnecessary and preventable death. For these reasons, this Court should find persuasive the particularly relevant Ninth Circuit Court of Appeals RUA decisional law that the Government did not bother to attempt to refute or distinguish.

## E. CONSCIOUSLY DISREGARDING THE KNOWN RISK OF A GOVERNMENT-CREATED EXTREME DANGER IN FAVOR OF PERSONAL CONVENIENCE CONSTITUTES WILLFULNESS

The Government concedes knowledge of the life-threatening risk of a public encounter with a recovering research grizzly bear, and that is precisely why the Government signs, warns and closes research locations without specific knowledge of recreationalists in the area, and why state and federal permits and closure orders specifically require the Government to do so. (*See* Aplt. Br. at 15-17; 26-27). Despite their knowledge of the extreme risk, and in furtherance of their own

11

personal agendas, the Government employees removed the signs at the moment the risk was most intense.

The Government's attempt to minimize the danger presented by its research bear, or equate the danger to that of a non-research grizzly bear, is discredited by its employees' testimony, *supra* at 7, and by Mrs. Evert's expert. *See* Aplt. App. at 170 (Dr. Marc Cattet opined that "the recent capture and handling of Bear #646 [made] it more likely to attack someone than if it had not been recently handled and captured"). The Government employees were consciously indifferent to the consequences of the known danger they created. *See Yalowizer v. Husky Oil Co.*, 629 P.2d 465, 470 n.6 (Wyo. 1981). As previously briefed, Mrs. Evert proved a reasonable inference exists that severe or fatal harm will probably and obviously follow when someone encounters an anesthetized grizzly bear without warning. (Aplt. Br. at 26-34).

The Government relies heavily on its employees' belief that Bear #646 "would soon recover" and that "the undisputed evidence demonstrates a bear will recover within a matter of hours." (Aplee. Br. at 40).[6] Purportedly viewing the

---

[6] Dr. Cattet has also opined that "[t]he administration of three doses of Telazol to Bear #646 over a 48-minute period more likely than not reduced the quality of anesthesia and extended the recovery period beyond the duration it would have been if the Telazol was administered as a single dose." (Aplt. App. at 168).

12

facts in a light most favorable to Mrs. Evert, the Government notes that Dr. Cattet had calculated average and median IGBST bear recovery times as 127 and 107 minutes respectively. (*Id*). Even if the Government's beliefs were accurate, the Government employees could have averted the grave danger they created, without impacting their goals of concluding trapping operations and returning home by leaving the warning and closure signs up for another couple of hours while they checked Site #2. Returning briefly, on horseback, the IGBST crew could have easily confirmed that Bear #646 had left the study area before removing the warning and closure signs, thus ensuring that Site #3 was once again suitable for recreational purposes and that no deadly traps had been laid for the public. The Government employees created a known hazard and left it as a trap for the public to encounter with a conscious indifference to the consequences.

Finally, the district court required that Mrs. Evert prove "the risk was so great as to make it obvious that harm would follow." (Aplt. App. at 32). The district court stated that the issue "is not what was obvious if a hiker encountered bear #646 before it recovered and left Site #3. The issue is whether it was obvious that a hiker would encounter bear #646 at Site #3." (Aplee. Br. at 42). Because the magnitude of danger was well known, the district court's narrow interpretation of its own test effectively imposed an improper requirement that Mrs. Evert prove the Government's employees intended to injure a recreationalist. (Aplt. Br. at 28,

13

30). The district court's test amounts to an improvable standard that would effectively require an admission of extreme criminal conduct by Government employees.

## II.   CONCLUSION

The record clearly demonstrates that, prior to June 17, 2010, Mr. Evert hiked amongst grizzly bears throughout the Greater Yellowstone Ecosystem for forty years without incident. As the Government is fond of pointing out, Mr. Evert and his family "encountered bears many, many, many, many, many times" including around their cabin. (Aplee. Br. at 6 (citing Aplt. App. at 327)). For four decades Mr. Evert safely enjoyed hiking and travelling through grizzly country. On the only day of his 70-year existence that Mr. Evert encountered a previously captured and recovering grizzly bear without any warning or closure signs, he was fatally mauled.

Following extensive briefing before the district court and this Court, the Government failed to cite to any Recreational Use Act ("RUA") authority, in any jurisdiction, in which a landowner is immune when it creates a danger by aggravating and altering a natural hazard, warns the public about this extreme danger, and then, with knowledge the danger it intentionally created actually exists, removes all warning and closure signs. The Government should not enjoy immunity from the consequences of its multiple failures and affirmative acts of

14

negligence. If this Court determines that the WRUA applies, then it should look to the compelling and persuasive Ninth Circuit analysis in interpreting the willful exception to RUA's. (Aplt. Br. at 34-42).

For all of the reasons set forth above, and in her Opening Brief, Mrs. Evert respectfully requests this Court reverse the district court's judgment and remand this case for trial.

DATED this 9th day of May, 2013.

> Respectfully submitted,
> /s/ *Emily R. Rankin*
> Emily R. Rankin
> Mark L. Aronowitz
> THE SPENCE LAW FIRM, LLC
> P.O. Box 548
> Jackson, WY 83001-0548
> Telephone: (307) 733-7290
> Fax: (307) 733-5248
> rankin@spencelawyers.com
> aronowitz@spencelawyers.com

## III.   CERTIFICATE OF COMPLIANCE

**Word Count**

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and complies with the type-volume limitation. The brief contains 3313 words.

I relied on my word processor, Microsoft Word, to obtain the count.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

By:   */s/ Emily R. Rankin*
Emily R. Rankin
THE SPENCE LAW FIRM, LLC

## IV.   CERTIFICATE OF DIGITAL COMPLIANCE

I hereby certify that a copy of the foregoing APPELLANT'S REPLY BRIEF, as submitted in Digital Form via the Court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with VirusTotal, dated May 9th, 2013, and, according to the program, is free of viruses. In addition, I certify all privacy redactions have been made.

By:   */s/ Emily R. Rankin*
Emily R. Rankin
THE SPENCE LAW FIRM, LLC

## V.   CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing APPELLANT'S REPLY BRIEF was furnished through (ECF) electronic service to the following on this 9th day of May, 2013:

Christopher A. Crofts
Nicholas Vassallo
C. Levi Martin
United States Attorney's Office
Post Office Box 668
Cheyenne, WY 82003-0668
Telephone: 307.772.2124
Fax: 307.772.2123

*Attorneys for Defendant/Appellee United States of America*

By:   */s/ Emily R. Rankin*
      Emily R. Rankin
      THE SPENCE LAW FIRM, LLC